# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JERALD LENTINI, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 1:25-cv-00166 (JMC) |
| DEPARTMENT OF GOVERNMENT | * | |
| EFFICIENCY, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

*     *     *     *     *     *     *     *     *     *     *     *     *

## PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY

NOW COME Plaintiffs Jerald Lentini, Joshua Erlich, and National Security Counselors, Inc., to respectfully move this Court for expedited discovery.

In support of this Motion, the Court is respectfully referred to Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Expedited Discovery.

Defendants oppose this Motion. A proposed Order consistent with the relief sought also accompanies this Motion.

Date:   March 3, 2025

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
1451 Rockville Pike
Suite 250
Rockville, MD  20852
501-301-4672
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JERALD LENTINI, *et al.*,          *
                                   *
        Plaintiffs,                *
                                   *
        v.                         *
                                   *        Civil Action No. 1:25-cv-00166 (JMC)
DEPARTMENT OF GOVERNMENT           *
EFFICIENCY, *et al.*,              *
                                   *
        Defendants.                *
                                   *
*    *    *    *    *    *    *    *    *    *    *    *    *

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THEIR MOTION FOR EXPEDITED DISCOVERY**

Plaintiffs respectfully bring this Motion to allow the parties to intelligently and quickly brief a motion for a preliminary injunction which Plaintiffs intend to file in the near future, based in large part on the ongoing large-scale actions being taken by the Department of Government Efficiency ("DOGE") and Elon Musk ("Musk"). Plaintiffs maintain that these actions are *ultra vires* because Musk and many of the individuals purported to be affiliated with the United States DOGE Service ("USDS") are in fact affiliated with a separate and distinct advisory committee which is operating without any accountability, fairness, or transparency.[1]

Plaintiffs now seek narrow and carefully tailored expedited discovery tied directly to the substance of their claims against Defendants and, in particular, the illegal composition of DOGE and the discrepancies between its membership and the individuals affiliated with USDS. Specifically, Plaintiffs request that Defendants make available for deposition within twenty

---

[1] For the purposes of this Motion, "DOGE" refers to this unlawful advisory committee run by Musk, while "USDS" refers to the U.S. DOGE Service and U.S. DOGE Service Temporary Organization established by President Trump on 20 January 2025 in Executive Order 14,158 ("E.O. 14,158" or "the Order").

calendar days the following individuals: (1) Musk; (2) Director Joshua Fisher of the Office of

Administration within the Executive Office of the President ("EOP"); and (3) Acting USDS

Administrator Amy Gleason. Plaintiffs request that the Court follow Judge Bates' lead and

authorize depositions of these individuals not to exceed eight hours in the aggregate. *See* Order,

Dkt. #48, at 1 (filed Feb. 27, 2025), *AFL-CIO v. Dep't of Labor*, No. 25-339 (D.D.C.) [*AFL-CIO*

Order].[2]

  The requested discovery is limited in scope and will clarify the relationships between

Musk, DOGE, USDS, and Defendant agencies. The information requested is directly relevant to

Plaintiffs' forthcoming Motion for Preliminary Injunction and is therefore appropriate to order

disclosed at this time. As set forth herein, the Court can and should authorize this expedited

discovery, which is reasonable under the circumstances and supported by good cause.

## FACTUAL BACKGROUND

  For ease of reading, Plaintiffs will not restate the entire relevant factual background for

this case as it was laid out in their First Amended Complaint. (1st Am. Compl., Dkt. #10, ¶¶ 31-

48, 83-98 (filed Feb. 13, 2025).) Instead, they will focus primarily on the actions taken by DOGE

and Musk since that filing, while referencing the allegations from the First Amended Complaint

as needed for context. Plaintiffs continue to stand behind the allegations from the First Amended

Complaint.

  Following the 2024 presidential campaign, President Trump, now serving as President of

the United States, announced his intention to appoint Musk and former Defendant Vivek

Ramaswamy to run a new organization, which was named the Department of Government

Efficiency, or "DOGE." Neither the structure, nor the mandate, nor the composition of this

---

[2] A significant portion of this brief has been copied from Judge Bates's thorough opinion in *AFL-CIO* and will generally not be cited as such for ease of reading.

organization were made public by the Trump transition team, and details concerning those matters have been obtained mostly through investigative journalism rather than public disclosure from the Administration. What *is* clear is that DOGE was originally intended to fit the definition of a federal advisory committee as that term is defined by the Federal Advisory Committee Act ("FACA"); President-Elect Trump repeatedly stated that DOGE would "provide advice and guidance from outside of Government" and would "partner with the White House and Office of Management and Budget to drive large scale structural reform, and create an entrepreneurial approach to Government never seen before." Donald J. Trump (@realdonaldtrump), Truth Social (Nov. 12, 2024 7:46 PM), *at* https://truthsocial.com/@realDonaldTrump/posts/113472884874740859 (last accessed Mar. 2, 2025).

Upon taking office on 20 January 2025, the Trump Administration began an unprecedented and illegal campaign of impounding appropriations, suspending and/or terminating public employees, cancelling grants and expenditures, and installing political minders at federal agencies. The Administration's demands have mostly been conveyed by Musk, or acting agency heads proceeding at Musk's behest.

Though "DOGE" is an acronym for the "Department of Government Efficiency," DOGE is not a department in any legal sense. As implied by the Government, "DOGE" purportedly encompasses two entities: the "United States DOGE Service" (USDS), which is housed within the EOP; and "the U.S. DOGE Service Temporary Organization," which is housed within USDS. Both organizations were established by E.O. 14,158 on 20 January 2025. However, there is significant evidence to indicate that while President Trump *did* rename the existing U.S. Digital Service, move it from the Office of Management and Budget ("OMB") to the EOP, and create a

temporary organization within it, he critically *did not* dissolve the existing DOGE advisory committee or make USDS its successor organization. Instead, from all of the currently available evidence, the DOGE advisory committee has continued to operate in the shadows, still run by Musk, and any implications that its actions are attributable to USDS are not reflective of the reality. It is this discrepancy which Plaintiffs' proposed expedited discovery is designed to resolve so that Plaintiffs can use the information they obtain in a forthcoming motion for preliminary injunction, which is urgently needed due to the drastic and damaging actions being taken by DOGE and Musk on an ongoing basis.

Simply put, all evidence points to Musk running DOGE, while he is not the USDS Administrator. Musk's public statements taking credit for DOGE activity (FAC ¶¶ 91, 94) are just the tip of the iceberg. As recently as 19 February, President Trump publicly stated, "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge." Anna Bower (@annabower.bsky.social), Bluesky (Feb. 19, 2025 6:11 PM), *at* https://bsky.app/profile/annabower.bsky.social/post/3likvkcjnr22h (last accessed Feb. 23, 2025). On 22 February, President Trump posted on social media, "ELON IS DOING A GREAT JOB, BUT I WOULD LIKE TO SEE HIM GET MORE AGGRESSIVE." Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 22, 2025 8:04 AM), *at* https://truthsocial.com/@realDonaldTrump/posts/114047677181856301 (last accessed Feb. 23, 2025). Within seven hours, Elon Musk posted on social media, "Consistent with President @realDonaldTrump's instructions, all federal employees will shortly receive an email requesting to understand what they got done last week. Failure to respond will be taken as a resignation." Elon Musk (@elonmusk), X.com (Feb. 22, 2025 2:46 PM), *at*

https://x.com/elonmusk/status/1893386883444437415 (last accessed Feb. 23, 2025). The promised email was sent out by OPM soon after.

Then, in a press conference on 24 February, President Trump reiterated that people who did not respond to Musk's OPM email would be "sort of semi-fired or . . . fired." Courtney Kube, *et al.*, *DOGE will use AI to assess the responses of federal workers who were told to justify their jobs via email*, NBC News (Feb. 24, 2025), *at*

https://www.nbcnews.com/politics/doge/federal-workers-agencies-push-back-elon-musks-email-ultimatum-rcna193439 (last accessed Mar. 2, 2025). Even after OPM reversed its earlier position and stated that responses were entirely voluntary, Musk posted on social media that same day that a second OPM email would be forthcoming and that "[s]ubject to the discretion of the President, [Government employees] will be given another chance[,]" warning that "[f]ailure to respond a second time will result in termination." Elon Musk (@elonmusk), X.com (Feb. 24, 2025 7:06 PM), *at* https://x.com/elonmusk/status/1894177129887404484 (last accessed Mar. 2, 2025).[3] And if it still was not obvious at this point that Musk was responsible for these actions, it became so when, in his first Cabinet meeting of the year, President Trump again acknowledged Musk's position as the head of DOGE: "I'm going to ask if it's possible to have Elon get up first and talk about DOGE. . . . So Elon, if you could get up and explain where you are, how you're doing, and how much we're cutting." *Trump: People who didn't respond to 'what did you do' email are on the bubble*, Scripps News (Feb. 26, 2025), *at*

https://www.youtube.com/watch?v=Jd-MlbvYIes (last accessed Mar. 2, 2025). Musk, for his part, consistently referred to "the DOGE team" as "we" over ten times in three minutes in his

---

[3] The second OPM email was sent on 28 February.

remarks to the Cabinet, while admitting that "we"—meaning DOGE—sent out the OPM email. *Id.*

Most recently, OPM conclusively drove home the message that it was following Musk's orders—and not USDS's—when it formally edited the Privacy Impact Assessment for the Government-Wide Email System to remove statements that responding to emails sent from that system was voluntary and instead state that the consequences for not responding depended on the email. *Compare* OPM, *Privacy Impact Assessment for Government-Wide Email System (GWES)*, at 8 (Feb. 28, 2025), *available at* https://www.opm.gov/media/kfpozkad/gwes-pia.pdf (last accessed Mar. 2, 2025) ("The consequences for failure to provide the requested information will vary depending on the particular email at issue."), *with* OPM, *Privacy Impact Assessment for Government-Wide Email System (GWES)*, at 7 (Feb. 5, 2025), *at* https://web.archive.org/web/20250222125024/https://www.opm.gov/media/kfpozkad/gwes-pia.pdf (last accessed Mar. 2, 2025) ("The Employee Response Data is explicitly voluntary. The individual federal government employees can opt out simply by not responding to the email.").[4]

Despite this public trail clearly identifying Musk as the instigator of numerous actions taken by DOGE, the Director of the EOP Office of Administration has, under penalty of perjury, stated that Musk is merely a "Senior Advisor to the President" and is "not an employee of the U.S. DOGE Service or U.S. DOGE Service Temporary Organization." Fisher Decl., Dkt. #24-1, ¶ 6 (filed Feb. 17, 2025), *State of N.M. v. Musk*, No. 25-429 (D.D.C.). This filing from EOP directly contradicts numerous party admissions made by both Musk and President Trump.

---

[4] Additionally, on 3 March, the plaintiffs' counsel in another case introduced evidence that emails ostensibly sent by the U.S. Agency for International Development ("USAID") were sent by DOGE personnel, and that those DOGE personnel and others were only given access to private data and restricted areas after "Elon Musk called USAID officials at least twice on February 1, 2025." Not. of New Evid. Not Prev. Avail., Dkt. #48, at 1-2 (filed Mar. 3, 2025), *Does 1-26 v. Musk*, No. 25-462 (D. Md.).

Plaintiffs believe that this has been a deliberate obfuscation of the truth, intended to allow Musk and DOGE to evade the necessary screening and oversight. As final support for that conclusion, they point to the following 25 February exchange between a journalist and White House Press Secretary Karoline Leavitt:

> Journalist: Can you tell us who the Administrator of DOGE is?
>
> Leavitt: Again, I've been asked and answered this question. Elon Musk is overseeing DOGE. There are career . . .
>
> Journalist: Who's the Administrator?
>
> Leavitt: No, Elon Musk is a special government employee, which I've also been asked and have answered that question as well. There are career officials at DOGE. There are political appointees at DOGE. I'm not going to reveal the name of that individual from this podium. I'm happy to follow up and provide that to you, but we've been incredibly transparent about the way that DOGE is working.

Anna Bower (@annabower), Bluesky (Feb. 25, 2025 2:02 PM), *at*

https://bsky.app/profile/annabower.bsky.social/post/3lizkhe6vpc27 (last accessed Mar. 2, 2025).

Within two hours of this press conference, the White House publicly stated that Amy Gleason ("Gleason") was the Acting USDS Administrator, which is why she is one of Plaintiffs' intended deponents, in addition to Musk and Office of Administration Director Fisher. However, this identification of Gleason as the Acting USDS Administrator does not resolve any of the lingering questions, since it took place a day before the aforementioned Cabinet meeting in which both Musk and President Trump identified Musk as the head of DOGE.

## **ARGUMENT**

## I.    **AUTHORITY AND STANDARD FOR EXPEDITED DISCOVERY**

District courts have broad discretion to manage the conduct of discovery. *Chavous v. Dist. of Cola. Fin. Resp. & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 2 (D.D.C. 2001). This discretion includes matters related to the timing of discovery. *Williams v. United States*, No. 17-

445, 2019 WL 13188840, at *1 (D.D.C. July 22, 2019) ("District courts have broad discretion in structuring the scope and timing of discovery.").

Generally, Federal Rule of Civil Procedure ("FRCP") 26 prohibits discovery until after the parties' Rule 26(f) conference, Fed. R. Civ. P. 26(d)(1); *see also* Local Civ. R. 26.2(a), which has yet to happen in this case. However, the FRCP also authorize courts to adjust the discovery timeline and to order expedited discovery. *Williams*, 2019 WL 13188840, at *1; *Dimension Data N. Am., Inc. v. Netstar-1, Inc.*, 226 F.R.D. 528, 529-30 (E.D.N.C. 2005); *Tribal Casino Gaming, Enter. v. W.G. Yates & Sons Constr. Co.*, No. 16-30, 2016 WL 3450829, at *3 (W.D.N.C. June 16, 2010). FRCP 26(d)(1) expressly provides that a party may obtain discovery before a Rule 26(f) scheduling conference "when authorized . . . by court order," as does Local Rule 26.2. FRCP 30(a), 33(b), 34(b), and 36 also permit the court to adjust the timing requirements imposed under Rule 26(d) and to expedite the time for responding to discovery requests.

However, the rules are silent as to "a standard to apply when determining whether expedited discovery is appropriate," leading courts to adopt the so-called reasonableness approach. *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014). Under that approach, "the Court considers the 'reasonableness of the request in light of all of the surrounding circumstances,' which include: '(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.'" *Id.* (quoting *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 142-43 (D.D.C. 2005)). These factors, however, do not form a hard-and-fast rule. Rather, they "are only guidelines for the exercise of the Court's discretion." *Id.*; *cf. Nixon v. Freeman*, 670 F.2d 346, 363 (D.C. Cir. 1982) ("A district court has broad discretion over . . .

discovery."). Under the reasonableness approach, the factors weigh in favor of granting

Plaintiffs' Motion.

A.        WHETHER A PRELIMINARY INJUNCTION IS PENDING

Courts frequently grant expedited discovery requests in conjunction with preliminary

injunction motions. *See, e.g., Malon v. Franklin Fin. Corp.*, No. 14-671, 2014 WL 5795730, at

*3 (E.D. Va. Nov. 6, 2014) (granting expedited discovery to plaintiff prior to anticipated

preliminary injunction motion); *Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F. Supp.

2d 664, 667-68 (M.D.N.C. 2009) (noting that the court had granted expedited discovery relating

to issues raised by the plaintiff's request for injunctive relief before the preliminary injunction

hearing); *see also Ciena Corp. v. Jarrard*, 203 F.3d 312, 324 (4th Cir. 2000) (remanding to the

lower court with instructions to provide the defendant an opportunity to conduct expedited

discovery in order to file a motion to dissolve a preliminary injunction); *Dan River, Inc. v.

Unitex, Ltd.*, 624 F.2d 1216, 1220 (4th Cir. 1980) (describing expedited discovery in the district

court in preparation for a preliminary injunction hearing).

While there is no preliminary injunction motion currently on the docket, that fact does

not mean that this factor weighs in favor of denying this Motion. Plaintiffs hereby state their

clear intention to file such a motion, and the parties are in the middle of negotiating a briefing

schedule—for the preliminary injunction motion as well as others—to propose to the Court.

Garnering support for that anticipated preliminary injunction motion is "the very purpose of

[Plaintiffs'] motion for expedited discovery." *Legal Tech. Grp. v. Mukerji*, No. 17-631, 2017 WL

7279398, at *3 (D.D.C. June 5, 2017). Plaintiffs' forthcoming motion for preliminary injunction

will be limited to enjoining USDS, Defendant agencies, and any of the "DOGE teams" operating

within Executive Branch agencies from taking direction from anyone besides Acting USDS

9

Administrator Gleason, while enjoining Gleason from taking direction from Musk. While related to the ultimate resolution of the case on the merits, this preliminary injunction would allow USDS and the DOGE teams to continue to operate while the Court adjudicates the question of whether DOGE (the advisory committee) should be permanently enjoined from interacting with any Government offices or officials under FACA.

### B.    THE BREADTH OF THE DISCOVERY REQUESTS

This factor does not warrant extensive discussion. Plaintiffs are seeking to depose only three individuals, each of whom has direct personal knowledge likely not available to anyone else about the evolution of DOGE and how Musk, USDS, agency DOGE teams, and Defendant agencies interact with each other. Furthermore, Plaintiffs are voluntarily limiting the duration of these depositions to eight hours in the aggregate—the same amount that Judge Bates approved for four FRCP 30(b)(6) depositions with a more limited scope. *AFL-CIO* Order at 14.

### C.    THE PURPOSE FOR REQUESTING THE EXPEDITED DISCOVERY

Since Plaintiffs have described above the scope of their forthcoming preliminary injunction motion, the expedited discovery is fairly described as having a purpose to "reveal information related to the preliminary injunction as opposed to the case as a whole." *See Guttenberg*, 26 F. Supp. 3d at 98 (denying expedited discovery that nominally sought to support a preliminary injunction motion but in fact went primarily to the merits); *Damus v. Nielson*, 328 F.R.D. 1, 4 (D.D.C. 2018). Furthermore, "the parameters of relevant discovery are [not] difficult to determine at this juncture in the case." *See 4SIGHT Supply Chain Grp., LLC v. Kent*, No. 19-12476, 2019 WL 13235533, at *2 (D.N.J. June 27, 2019) (explaining why the lack of a pending preliminary injunction motion can warn against granting discovery).

10

Furthermore, given that the only reason that Plaintiffs need discovery on these questions is because of the Government's shifting public explanations of Musk's role in DOGE and its continued insistence on obfuscation and ambiguity, it cannot be said that this Motion is merely "a thinly veiled attempt to circumvent the normal litigation process." *In re Fannie Mae*, 227 F.R.D. at 143. As Judge Bates succinctly put it: "Quite the opposite." *AFL-CIO* Order at 9.

D.    **THE BURDEN ON THE DEFENDANTS TO COMPLY WITH THE REQUEST**

The discovery being sought through this Motion is not burdensome. Plaintiffs simply request that the three Government employees with the most reason to understand the complex relationships in question—who may very well be the *only* individuals in or out of the Government who possess sufficient understanding to answer Plaintiffs' questions intelligently—be made available for depositions within twenty calendar days. Given the time-sensitive nature of the proceedings and the unique firsthand knowledge each has to offer regarding the operations of DOGE entities and personnel, this expedited deadline is warranted.

E.    **HOW FAR IN ADVANCE OF THE TYPICAL DISCOVERY PROCESS THE REQUEST WAS MADE**

In *Guttenberg*, Judge Bates explained that the "most important" factor in the court's decision to deny the motion for expedited discovery in that case was that there was a pending motion to dismiss, showing that "plaintiffs' request for expedited discovery c[ame] 'well in advance of typical discovery.'" *Guttenberg*, 26 F. Supp. 3d at 99 (quoting *Landwehr v. FDIC*, 282 F.R.D. 1, 4 (D.D.C. 2010)). Judge Bates explained that permitting expedited discovery when said motion was pending could require defendants "to expend significant resources in responding" to requests even though there was a chance the court would "then grant defendants' motion to dismiss," making the expenditure all for nothing. *See id.* So, in that case,

"reasonableness dictate[d] that the Court consider defendants' motion to dismiss before requiring . . . discovery." *Id.*

While a pending motion to dismiss generally cuts against a plaintiff's motion for expedited discovery, that uncontroversial statement has no applicability here. First, simply put, there is no pending motion to dismiss, although Defendants' counsel have advised Plaintiffs that they intend to file one. Second, even if the absence of a pending motion to dismiss were not a determinative factor, this case is more analogous to *AFL-CIO*, where Judge Bates held that case was "not the standard civil case in which a motion to dismiss is filed before any legal or factual development." *AFL-CIO* Order at 15. To be fair, it is not a perfect fit, since that case involved two motions for temporary restraining orders, which "produced a record, albeit minimal, and . . . revealed the parties' legal arguments." *Id.* However, since this case relies heavily on a substantial *public* record—in the form of the public actions taken by and public statements made by Defendants—it is a close relative to *AFL-CIO* in this respect. Plaintiffs agree that, like *AFL-CIO*, this is "a close question," *id.*, but maintain that these similarities outweigh the differences and that "reasonableness [does not] demand[] prohibiting expedited discovery until the resolution of defendants' impending motion to dismiss." *Id.* at 16 & n.6.

## III.    THE STANDARD APA RULE DOES NOT APPLY HERE

In expectation of Defendants' objection that a "[c]ourt must generally base its review in an [Administrative Procedure Act ("APA")] case 'on the full administrative record that was before the [agency] at the time [it] made its decision,' not on a record generated by the parties through the discovery process," *id*. (alterations in original) (quoting *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001)), Plaintiffs will briefly explain why, like *AFL-CIO*, "this is not an ordinary APA case." *AFL-CIO* Order at 5. The agency action challenged here

is unlike the actions normally challenged in APA cases, such as a promulgated regulation or a grant or denial of an application. The core allegation of this case is that Musk and DOGE are operating *independently* of any agency, and as such *there will be no administrative record*. And that, for their part, the Defendant agencies have adopted a general practice of following the directions of Musk and DOGE. In such situations, a court may depart from the default APA no-discovery rule. *See Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 360 (D.C. Cir. 2005).

For example, in *Hispanic Affairs Project v. Acosta*, plaintiffs brought a claim under the APA alleging that the Department of Homeland Security ("DHS") had a "practice of habitually approving and extending H-2A visas for lengthy periods of time." 901 F.3d 378, 388 (D.C. Cir. 2018). DHS argued that the plaintiffs did not adequately allege a challengeable agency action but rather a "programmatic challenge." *Id.* at 387-88. The D.C. Circuit disagreed, determining that the plaintiffs alleged a "particular practice" that would be challengeable if found to exist. *See id.* at 388. So the Circuit remanded to the district court, explaining that, "[o]n remand, the district court [wa]s free to exercise its discretion to permit further discovery to ascertain the contours of the precise policy at issue." *Id.* (internal quotations omitted); *see also Venetian Casino Resort*, 409 F.3d at 360.

In this case—as in *AFL-CIO*—the "contours of the precise policy at issue" are far from defined. *See id.* at 388. As such, the discovery requested here is appropriate, for it is not so much "fact-finding" as it is "filling in gaps . . . to determine what the agenc[ies] actually did." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1227 (D.C. Cir. 1993). Most importantly, determining "what the agencies actually did" necessarily requires determining how Musk and DOGE (the advisory committee) interact with USDS and other agencies, as well as those entities' understanding of the relationship.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs' Motion for Expedited Discovery should be granted, and Defendants should be required to make Elon Musk, Joshua Fisher, and Amy Gleason available for deposition within twenty calendar days.

Date:   March 3, 2025

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
1451 Rockville Pike
Suite 250
Rockville, MD  20852
501-301-4672
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*